## GRAY v. PET MILK CO.
### No. 6875.

Circuit Court of Appeals, Seventh Circuit.
Jan. 12, 1940.

Rehearing Denied Feb. 5, 1940.

Wayne Ely, of St. Louis, Mo., and Arthur Melvin, of Marion, Ill., for appellant.

Ralph F. Lesemann, of East St. Louis, Ill., for appellee.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from a judgment in favor of the appellee in an action for damages for serious illness and permanent injury to her health alleged to have been caused by her use of a can of evaporated milk prepared by appellant, in which the body of a mouse was contained. The first count of her bill of complaint alleged negligence in the preparation and canning of the milk; the second alleged the violation of sections 5 and 8 of Chap. 56½, Ill. Revised Statutes relating to the manufacturing of adulterated or misbranded foods, and the definition of adulteration. The case was tried to a jury which found appellant liable, and assessed the damages at $6,000.

Appellant contends that a verdict should have been directed in its favor on both counts because there was no showing of negligence on its part in the preparation of the milk, no competent evidence to prove that appellee was in fact poisoned by it,

and the statute relied upon in the second count was not applicable.

There was substantial evidence to support the following facts: Appellee, a woman in her early thirties, kept house for her father, an unemployed coal miner. On the morning of November 16, 1936, she sent him to a grocery store to purchase a can of Pet Milk, which she opened in order to prepare cocoa for lunch on that day. Her method of opening the can was by punching two small holes in the top from which she then poured enough milk to make the cocoa, setting the can containing the balance of the milk in the refrigerator. For the meal she served only the cocoa and some cookies which her father had also purchased from the same store when he bought the milk. She drank part of one cup of cocoa, but did not eat anything. He drank two cups. About an hour after the meal, the father became violently ill. He went to bed, and about an hour later, went to see a physician, Dr. Pearce. While he was gone, appellee also became ill, suffering from a severe headache and vomiting. Appellee testified that prior to this time the health of both herself and her father had been good. When her father returned from the doctor's office he brought a friend with him, and appellee got up and prepared the evening meal, eating nothing herself. When she attempted to pour some of the milk from the can for coffee for the friend, she found that it would not pour freely, whereupon she took the can opener and made the opening larger, cutting the lid halfway off. She then found that the obstruction was caused by the body of a mouse, and set the can aside in a place where it was in sight of all of them. After the meal, her father and his friend both investigated, and they also saw the mouse. Another friend came in and they showed it to him, and then her father took the can over to show it to Dr. Pearce who had attended him that afternoon. He also showed it to the manager of the store from which he had purchased it. The following morning, at the request of this manager, he left the can at the store in order that the latter might show it to the supervisor. The can was subsequently thrown into the fire because its smell was offensive, although the father had requested that it be kept for him.

Appellee continued to be very ill, and after five days, went to a hospital operated by Dr. Pearce where she remained ten or twelve days. After her return to her home she continued to have severe headaches and stomach cramps, and she lost a great deal of weight. In March, 1937, she returned to the hospital for two weeks during which an operation was performed upon her. In April she returned for another two weeks at the hospital, suffering from the same headaches and cramps and severe weakness. She also, at this time, broke out in a rash, suffering from sores which came all over her body, and from which she testified she was still suffering at the time of the trial. She was in the hospital for two more periods, one of two weeks and the last from some time in January, 1938, to March or April of that year.

In addition to her own and her father's testimony as to her illness immediately following upon the use of the canned milk, and the circumstances surrounding the opening of the can and the finding of the mouse, appellee also introduced the evidence of the two friends, one of whom was present when the can was opened and the mouse discovered, and the other who came very shortly after, and also saw the mouse. She also introduced the manager of the store from which the can was purchased who testified that he saw the half-full can of milk with the body of the mouse in it during an evening on or about the date fixed by the father; that the father left it at the store the following day at his request; and that he threw it in the stove a few days later after showing it to the store supervisor. All except the manager testified as to the condition of the mouse which indicated that it had not died recently.

Appellee also introduced the testimony of her physician, Dr. Pearce, to the effect that he first called upon her on November 18, two days after the onset of the illness, and that he diagnosed her illness as "food poisoning taken from a dead mouse." He described the treatment used in his unsuccessful attempts to relieve her. He stated that when she was taken to the hospital in March, she was suffering from extreme nausea and vomiting, and a uterine hemorrhage which he thought was caused from the continuous condition of vomiting. He operated on her on March 11, finding a blood tumor on an ovary. She made a rapid recovery from the operation but continued to suffer from the gastrointestinal disturbance. About a month after she left the hospital, he stated, large red

spots began to appear on her abdomen. These spots were very sore and painful, with a pus discharge, and he was unable to find their cause, although he tried a number of treatments for them, and gave her many tests, including those for malaria, typhoid, syphilis, and gonorrhea. The results of all of these were negative. He also sent a specimen of her blood to the State Department's Laboratory, asking them for a diagnosis from the history of the case and the blood test, but they reported that they could find nothing. He stated that he "was bound to believe it was caused from the food poisoning," and that "it was caused from poisonous food, that day she drank the Pet Milk." In response to the question, "In your opinion, as a physician and with reasonable medical certainty, can you say that these disturbances you have told us about could, or might, have resulted from drinking milk containing the body of a mouse?" he replied, over appellant's objection, "I would say that it could, or there is a possibility of it being something else * * *" He also testified that in his opinion appellee was totally and permanently disabled, and that his charge for hospital and medical services amounted to $1,289.20.

On cross-examination Dr. Pearce admitted that he had never before treated a severe case of food poisoning; that he did not know what kind of poison a dead mouse could create, and could name no bacteria which could not be killed by a 200 degree temperature; that he had never seen a rash like the one on appellee's body and from an examination of it would not be able to say what caused it. Appellant contends that by his testimony the physician disclosed his own lack of qualification to render an opinion as to the cause of appellee's condition, and that his opinions should therefore have been excluded from consideration by the jury. From our reading of the entire testimony of Dr. Pearce we cannot say that he was so clearly disqualified as to render his opinions inadmissible. The cases relied upon by appellant in support of this proposition are not applicable to the facts here involved.[1] We therefore find no error in the rulings of the court in admitting the opinion evidence of Dr. Pearce, and we hold that such evidence was sufficient to take the case

to the jury, even though it was contradicted by the testimony of another physician.

To refute the evidence as to appellee's illness, appellant introduced that of Dr. Moore, appointed by the court to examine appellee, at appellant's request for an examination. He was not known to nor selected by appellant. He conducted this examination on November 12, 1938, finding her a "well-nourished woman in apparent good health," with nothing indicating bad health or sickness as to the heart, neck, chest, or head. He also found small scars which were apparently healed wounds on the abdomen and which he thought were from chemical burns, caused by the application of chemicals to the skin. He stated that he found no indication that she was suffering from the result of food poisoning, and that he did not think that it was possible for prolonged vomiting over a period of weeks or months to produce a condition that would cause bleeding through the fallopian tubes or cause a haemotoma on an ovary. This evidence was in conflict with that offered by Dr. Pearce, but it was for the jury to determine which it considered more credible. While we might have reached a conclusion quite different from theirs, we cannot say that theirs constitutes reversible error.

To prove the absence of negligence on its part, appellant produced as a witness the manager of the can-making department at the plant where the can here involved was made and filled. He described the method used, including sterilization of the filled can under steam pressure at a temperature of 240 degrees for thirty minutes. The description tended to prove the impossibility that a mouse could get into the can during the process. However, by cross-examination, and by a rebuttal witness, it appeared that, while ordinarily the cans moved continuously along a moving belt conveyor without stops from the time the flat strips of tin to be formed into cans were put on the conveyor until the cans were completed with covers, ready for filling, at times stoppages occurred in the line, by jamming of the machinery. At such times the operation might be held up as long as five minutes, during which time the cans remained motionless on the conveyor, in a horizontal position, with

[1] See Svenson v. Mutual Life Ins. Co., 8 Cir., 87 F.2d 441; Corrigan v. United States, 9 Cir., 82 F.2d 106; Atlantic Life Ins. Co. v. Vaughan, 6 Cir., 71 F. 2d 394; Hardy-Burlingham Mining Co. v. Baker, 6 Cir., 10 F.2d 277; United States v. Kiles, 8 Cir., 70 F.2d 880.

open ends, protected by a guard rail only half as wide as the cans. It also appeared that there were a few places in the plant where it might be possible for a mouse to drop onto the conveyor or to jump up onto it, and that such places were not protected by any kind of cover. We think the evidence as to this point was sufficient to go to the jury on the question of negligence, when coupled with the fact of the uncontradicted evidence of three witnesses who saw the can opened and had it in view from that time until each actually saw the body of the mouse.

After appellant rested its case, appellee offered in rebuttal the evidence of one Henrichs, a chemist and toxicologist who was permitted to testify over appellant's objection both to his qualifications and to the admissibility of such evidence in rebuttal. His testimony was intended to show that such bacteria and toxins as were commonly found in mice would not be destroyed by subjection for thirty minutes to a temperature of 240 degrees. We think appellee properly contends that she was not bound to introduce such evidence until after appellant's defense that, even if in spite of its contention that such a thing was impossible, the jury should find that there was a mouse in the can of milk before appellee opened the can, such mouse would have been rendered innocuous, by the process of sterilization employed by it. Under these circumstances, we are of the opinion that the evidence was proper rebuttal. From our reading of the record, we are also convinced that the witness was properly qualified to testify as an expert.

We therefore hold that there was no error in denying appellant's motion for a directed verdict on the first count, and that since there was enough evidence to go to the jury on the question of appellant's negligence and of appellee's poisoning as a result thereof, we cannot disturb its verdict.

Appellant's contention that the statute alleged by count two, to have been violated is not applicable to this case does not require extended discussion. Section 5 of the statute in question, Chap. 56½, Ill.R.S., provides:

"It shall be unlawful for any person to manufacture for sale within the State of Illinois any article of food or drink which is adulterated and misbranded within the meaning of this act. It shall be unlawful for any person to use filthy, decomposed, putrid, rotten, deleterious or poisonous substances as a constituent part of manufactured food, or in the manufacture of any food. * * *"

Section 8 provides:

"That for the purpose of this act, an article shall be deemed to be adulterated —* * *

"In case of food:

"First—If any substance has been mixed or packed with it so as to reduce or lower or injuriously affect its quality, strength or purity. * * *

"Sixth—If it consists in whole or in part of a filthy, decomposed or putrid, infected, tainted or rotten animal or vegetable substance or article, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

We think the absence of intent to place in the can the body of the mouse does not render the statute inapplicable to the facts here involved. However, in view of our decision that the judgment was properly rendered as to count one, it is unnecessary for us to rest our decision on the second count, and we refrain from further comment.

Judgment affirmed.