## ARMIT v. LOVELAND et al.
### No. 7340.

Circuit Court of Appeals, Third Circuit.

Oct. 15, 1940.

Otto Kraus, Jr., and Howard M. Long, both of Philadelphia, Pa., for appellants.

Abraham E. Freedman and Freedman & Goldstein, all of Philadelphia, for appellee.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The plaintiff, a seaman, filed suit in the court below under the Jones Act, 38 Stat. 1185 and 41 Stat. 1007, 46 U.S.C.A. § 688, to recover damages for personal injuries alleged to have been suffered by him through the negligence of the defendants. It is from the judgment entered on the verdict for the plaintiff that this appeal was taken, the trial court having denied the defendants' motions for judgment n. o. v. and for a new trial.

The plaintiff, Armit, having twenty-two years' experience as a seaman, boarded the tug "Hoodless" as her chief engineer on July 26, 1937. Shortly before the start of a tow from Philadelphia to Chesapeake City, Maryland, during which the plaintiff received the injuries for which he brought suit, he noted the absence of splash plates about the engine. He asked one Smartly, superintendent in charge of the upkeep of boats for the defendant, Loveland & Co., Inc., for splash plates or material with which he could make them. He was denied both. Splash plates are used to prevent oil and water from being thrown about from the rotation of the engine's crank. The tow departed a little after midnight on the morning of July 27th. The second engineer was on duty at the time, Armit not being due to take his turn on watch until 6 A. M. About 4 A. M. the second engineer awoke the plaintiff to inform him that a feed line in the engine room had sprung a leak and that water had come in over the floor plates. Armit promptly descended to the engine room and with the second engineer's assistance repaired the line. As the dynamo on the tug had broken the day before, lanterns were used for illumination and it was testified that the light was "not very good". The engine had splashed a large amount of oil all over the engine room and onto the ladder leading from the engine room to the deck above. Splash plates would have obviated this condition to a considerable extent. As the plaintiff was ascending the ladder leading from the engine room, the oil on the treads of the ladder caused him to slip and fall to the floor.

The fall rendered the plaintiff unconscious and caused injuries to his chest. He reported the accident to the captain and asked to be put ashore for treatment, but the captain requested that he hold off until they had reached their destination. When the tug arrived at Chesapeake City, Armit reported his injury to the representative of Loveland & Co., Inc., located there and was taken to a doctor who strapped him and recommended that an X-ray be made. After the tug had returned to Philadelphia, Armit went to Loveland & Co.'s office and reported his injury to Loveland, Jr., who was vice president of that company, and to one Maguire, a superintendent of Loveland & Co., who gave Armit a hospital slip. Thereupon, he went to the United States Public Health Service

for examination, where he was X-rayed and restrapped. According to the specialist at the Public Health Service, the X-ray showed a fracture of the tenth rib with no other involvement. Armit continued his duties until August 29, 1937, when, feeling the need of further examination, he went ashore at Cambridge, Maryland, to consult a physician. This doctor also took an X-ray, which disclosed fractures of the ninth and tenth ribs but no other pathology. The plaintiff continued with his duties for the defendants until December 7, 1937, when he was laid off. He was unemployed until April 4, 1938, when, without physical examination, he was employed as an assistant engineer on a boat belonging to another company. Some ten months later, upon being examined by the doctor for the latter company, Armit was disqualified for further employment because of his physical condition. Since then he has been unemployed except for a few days.

Following the accident, the plaintiff lost considerable weight, a condition which existed at the time of trial. He suffers from a deformity of the lower portion of the thorax and from emphysema of the lungs, which is described as a distention and dilation of the air cells, rendering it difficult to get fresh air into all portions of the lungs. This condition, which becomes progressively worse, is disabling. As a result, the plaintiff has been unable to engage in his regular work or in any gainful employment and will so continue in the future. In opposition to expert opinion produced by the defendants that the plaintiff's chest condition was congenital, he was allowed to prove in rebuttal, over the defendants' objection, the portion of his discharge from the army, dated February 1, 1919, which certified that he was in good health when discharged.

The jury returned a verdict for the plaintiff in the sum of $10,000, which the defendants assert is excessive. All three defendants deny liability on the ground that the evidence did not establish their negligence. In addition, Chesapeake City Towing Corporation contends that it could not be liable in any view, as it was not incorporated until two months following the accident and that the relationship of employer and employee could not, therefore, have existed between it and the plaintiff at the time of the accident.

In support of their appeal, the defendants contend (1) that their negligence was not

established, (2) that the proofs were insufficient to show that the plaintiff's physical condition was a result of the fall, (3) that the certificate of the plaintiff's army discharge that he was then in good health was incompetent, (4) that the trial court erred (a) in failing to define negligence properly and (b) in submitting to the jury the question of liability as to all three defendants, (5) that the verdict was excessive, and (6) that the charge of the court contains incorrect statements. We shall consider these contentions seriatim.

█ The Jones Act expressly extends to a seaman who has suffered injuries during the course of his employment the right of action which the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., confers upon railway employees. Panama R. R. Co. v. Johnson, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748. Consequently, negligence is the basis of an injured seaman's action for damages under the Jones Act. 35 Stat. 65, 45 U.S.C.A. § 51. Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082. While negligence has been variously defined, it has lately been authoritatively redefined as being "any conduct, except conduct recklessly disregardful of the interest of others, which falls below the standard established by law for the protection of others against unreasonable risk of harm". Restatement of the Law, Torts, § 282. A standard of conduct established by law with respect to employers of seamen is that they shall provide their employees with a safe place in which to work. See Socony-Vacuum Oil Company v. Smith, 305 U.S. 424, 428, 59 S.Ct. 262, 83 L.Ed. 265, where a trial court's instruction to the jury to the above effect was approved. In the present case, the trial court left it to the jury to determine, inter alia, whether the defendants had breached their duty in the premises to the plaintiff. The evidence fully warranted the court's action.

█ The throwing of oil about the engine room and upon the ladder leading therefrom was the natural and foreseeable result of the rotation of the engine's crank in the absence of splash plates. It was equally apparent that the slippery properties of the oil made the floor of the engine room and the treads of the ladder an unsafe place upon which to step. Any thought of assumption of risk on the part of the plaintiff is not germane to the question of the ship owners' negligence in the maintenance of the unsafe condition. Assumption of risk is not even available as an affirmative defense to an action under the Jones Act. The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075, and Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082. This is so notwithstanding that the complaining seaman's injuries are the result of his use of a known unsafe appliance or method although he had a free choice to avoid the use of it. Socony-Vacuum Oil Company v. Smith, supra, 305 U.S. at page 428, 59 S.Ct. 262, 83 L.Ed. 265.

█ The peculiar circumstances attendant upon a seaman's discharge of his duties were the justification for the exclusion of assumption of risk as a defense under the Jones Act. As was said by Mr. Justice Stone in Socony-Vacuum Oil Company v. Smith, supra, 305 U.S. at page 431, 59 S.Ct. at page 266, 83 L.Ed. 265— "seamen are the wards of the admiralty, whose traditional policy it has been to avoid, within reasonable limits, the application of rules of the common law which would affect them harshly because of the special circumstances attending their calling. * * * It is for this reason that remedial legislation for the benefit and protection of seamen has been liberally construed to attain that end." The same peculiar circumstances attending the employment alike require that the rules of the common law respecting proof of the employer's negligence be not visited too rigorously upon seamen. Stated conversely, a higher degree of care is required of the employers of seamen than is required of employers of servants for work ashore. Storgard v. France and Canada S. S. Corp., 2 Cir., 263 F. 545, 547, 548.

█ Judged by the standards set by law, the employers' negligence was a permissible finding from the evidence in the instant case. The plaintiff's request for needed splash plates or the material with which to make them was arbitrarily denied. As a direct consequence, the plaintiff, a seaman, had no alternative in the discharge of his duty but to put to sea without the splash plates on the engine or the correction otherwise of the condition which their absence necessarily and obviously produced. He was bound to use the equipment and appliances which his employers furnished. Storgard v. France and Canada S. S. Corp., supra.

The appellants argue, however, that their failure to prevent the throwing of the oil, by the use of splash plates, was not a violation of a duty to the plaintiff, contending that the United States inspection laws make no requirement of splash plates on the engines of boats operating in inland waters, as did the "Hoodless". Even if this were so, the want of a statutory requirement would not serve to relieve the owners from their common law duty to furnish their seamen with a safe place in which to work. See Restatement of the Law, Torts, § 286, comment f. It is immaterial to the question of negligence whether the violated standard of conduct is established by statute or by the common law so long as it is established by either. Nor does a certificate of government inspection and approval relieve the owners of a boat for a proven negligent condition thereon. The case of Panama Mail S. S. Co. v. Davis, 3 Cir., 79 F.2d 430, which the appellants cite, is not in point. There the ship owner was relieved of liability for a condition which was the direct result of his acquiescence in a governmental requirement which was carried out by qualified government inspectors. As a consequence, it was held that the ship owner had exercised ordinary care and prudence in relying upon the inspectors to discharge their positive duty properly. However, such is not this case, where, as the appellants themselves assert, it was no official concern of the inspectors whether the engine of the "Hoodless" carried splash plates or not.

Coming to the appellants' second point, that the plaintiff failed to establish that the emphysema and other chest involvements from which he suffers were caused proximately by the fall, the medical testimony produced by the plaintiff fully warranted the finding implied by the jury's verdict. The testimony of the plaintiff's expert witnesses that the trauma could and probably did cause the emphysema was sufficient to justify the jury's finding. The law does not require that such testimony amount to dogma or that it foreclose the exercise by the jury of its function to determine the ultimate fact. Gray v. Pet Milk Co., 7 Cir., 108 F.2d 974, 976; Woelfle v. Connecticut Mutual Life Ins. Co., 8 Cir., 103 F.2d 417, 419; United States v. Steadman, 10 Cir., 73 F.2d 706, 709. On the other hand, the testimony of the defendants' three medical witnesses, two of whom had never even examined the plaintiff, at most, did no more than raise a reasonable difference of opinion. The defendants' medical witnesses actually contradicted each other. Thus, one expert for the defendants, testifying from X-ray plates without an examination of the plaintiff, gave it as his opinion that the plaintiff was suffering from emphysema but that it could not have been caused by the trauma, while another of the defendants' experts testified that a diagnosis of emphysema could not be made from an inspection alone of X-ray plates without a physical examination of the patient and that "We do not know the cause of emphysema. That is not known." Whether the fall produced the plaintiff's admittedly impaired physical condition was peculiarly for the jury. Restatement of the Law, Torts, §§ 431 and 434.

The defendants also asserted that the plaintiff's emphysema was congenital. This, they based on the opinion of expert witnesses with respect to the condition of a man who was then fifty years old and whom the experts had never seen until a short while before. To meet the imputation, which carried the plaintiff's pathology back to his birth, he offered in evidence the portion of his army discharge of February 1, 1919, which certified that he was then in good health. So much of the certificate as related to the plaintiff's health was admitted in evidence over the defendants' objection; and, for that, the appellants now assign error. Their objection goes merely to the competency of the discharge as evidence.

It is our opinion that the trial court's action in admitting the discharge in evidence was not error. "A certificate of service in army, navy, or civil office, made pursuant to duty imposed by custom or statute, is admissible, on principle." Wigmore on Evidence, 3rd ed., Vol. V, § 1675a. See also United States v. Harbanuk, 2 Cir., 62 F.2d 759. As Professor Wigmore observes, in the text above cited, such a certificate "is made for the specific purpose of being exhibited and used" and constitutes "virtually no more than a certified copy, in summary, of the regular record of service kept in the department", which, of itself, would be admissible as would also a certified copy thereof. The thing that gives a discharge its evidentiary value is the fact that it is a record made in the performance of an officer's duty, and so far as its effect is concerned, it is immaterial whether the duty is imposed by

statute or arises under well established official practice or custom. The case of Commonwealth v. Crowley, 26 Pa.Super. 124, cited by the appellants, is not controlling here in a case which involves the enforcement of a right conferred by federal statute. "The kind or amount of evidence required to establish it [i. e., a right under federal statute] is not subject to the control of the several states." Chicago, Milwaukee & St. Paul R. R. Co. v. Coogan, 271 U.S. 472, 474, 46 S.Ct. 564, 565, 70 L.Ed. 1041. See also United States Fidelity & Guaranty Co. v. Koch, 3 Cir., 102 F.2d 288, 293. Moreover, in the Crowley case, supra, the state court deemed it unnecessary "to determine the question whether the discharge offered in evidence is self-authenticating and prima facie admissible as evidence for any purpose". Patently, the question here involved was not there decided. It would, indeed, have been highly unjust to preclude the plaintiff in the present case from introducing an officially recorded fact as to his physical condition at a time made relevant and material by the testimony of the defendants' doctors, when the recorded fact carried with it the presumption of having been entered veritably and was wholly free from the taint of biased or self-interested inspiration. It will be recalled that the certificate was not offered in the plaintiff's case in chief to prove his prior physical condition. Whether the discharge was competent for all purposes we need not consider or decide. It came into the case below in appropriate rebuttal to sweeping opinions of witnesses for the defendants and the court properly admitted it in evidence for that particular purpose.

The appellants' objection to the trial court's charge with respect to negligence does not question the court's definition of negligence in general, which was both correct and adequate. They complain, rather, that the court did not also say in connection with its charge that the defendants' negligence, if any, had to be found in a violation by the defendants of a duty which they owed to the plaintiff. We think the court said as much when it instructed the jury that—"The negligence in this case is alleged to consist in not providing a safe place for the plaintiff to work." As it was the defendants' duty to so act (Socony-Vacuum Oil Co. v. Smith, supra, 305 U.S. at page 428, 59 S.Ct. 262, 83 L.Ed. 265), this instruction could only mean that the negligence in the case consisted of the defendants' violation of their duty to the plaintiff. The defendants, moreover, made no request at trial for more specific instructions with respect to the necessity of the jury's being able to find a violation of a duty by the defendants before the latter could be held to have been negligent. Their complaint, therefore, now comes too late. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Was a verdict against all three defendants permissible? The right of action conferred by the Jones Act, as in the case of the Federal Employers' Liability Act, accrues only where an employer and employee relationship exists. Cromwell v. Slaney, 1 Cir., 65 F.2d 940, 941; Christianson v. Western Pacific Packing Co., D.C., 24 F.Supp. 437, 439. To sustain the verdict against all three defendants it is necessary, therefore, that such a relationship existed between the defendants and the plaintiff at the time of the latter's injury. That S. C. Loveland & Co., Inc., had employed Armit on March 29, 1937, and had not discharged him prior to the accident on the morning of July 27, 1937, clearly appears. The record further shows that Loveland, Jr., individually, held the title to the "Hoodless" and that Armit was employed thereon as chief engineer by Loveland, Jr., on July 27, 1937. No charter for the "Hoodless" from Loveland, Jr., to Loveland & Co. was shown to have existed at any time. Yet the testimony supports a finding that Loveland & Co. was both operating and supervising the "Hoodless" at the time of the injury to the plaintiff. Loveland, Jr., held the title to the "Hoodless" "pending the formation of Chesapeake City Towing Corporation (defendant) to which corporation title was conveyed on September 21, 1937". The Chesapeake City Towing Corporation also took over the business and assets of S. C. Loveland & Co., Inc. Loveland, Jr., in addition to being vice president of S. C. Loveland & Co., Inc., was president of Chesapeake City Towing Corporation. Thus, the Towing Corporation at once became the embodiment of Loveland, Jr.'s activities in respect of the "Hoodless" as was at all times intended and also the successor to S. C. Loveland & Co., Inc. The liability to the plaintiff growing out of the operation of the "Hoodless" attached accordingly to the Chesapeake City Towing Corpora-

tion. Central Railroad Co. v. Paul, 5 Cir., 93 F. 878; Austin v. Tecumseh National Bank, 49 Neb. 412, 68 N.W. 628, 35 L.R.A. 444, 59 Am.St.Rep. 543; Baker Furniture Co. v. Hall, 76 Neb. 88, 107 N.W. 117, 111 N.W. 129, 113 N.W. 267. The fact that the plaintiff was employed on the "Hoodless" at the time of his injury is not in dispute, and it was possible for him to have more than one employer. Restatement of the Law, Agency, § 226. If the defendants so scrambled their relations as to render it difficult for anyone to say for a certainty whether the plaintiff was employed by only one or by all of them that should not serve to defeat the plaintiff's right by relieving a responsible defendant. To hold otherwise would be to put a premium upon the confusion which the defendants themselves created. The ones responsible for it should be the ones to dispel it, which they can do by adjusting their respective liabilities inter se. In the circumstances here present, we can see no legal necessity for requiring the plaintiff to grope around in search of his employer's identity among corporate entities and individuals, all of whom are shoots off the same stock and engaged in a common activity. A verdict against all three defendants was warranted. Lang et al. v. Hanlon et al., 302 Pa. 173, 178, 153 A. 143.

In view of the plaintiff's proven loss of earnings and his loss of earning power, coupled with his expectancy, we cannot say that the damages awarded by the jury were excessive. Courts in general are reluctant to disturb a jury's verdict on the ground of excessiveness where the damages are unliquidated and there is no fixed measure of mathematical certainty. Powers v. Wilson, 2 Cir., 110 F.2d 960; United States Can Co. v. Ryan, 8 Cir., 39 F.2d 445, certiorari denied, 282 U.S. 842, 51 S.Ct. 23, 75 L.Ed. 748. This is particularly significant with respect to damages in tort actions for personal injuries.

There is no merit in the appellants' remaining complaint respecting alleged misstatements in the trial court's charge to the jury. The trial was conducted with impartiality to the parties and the court's charge was both fair and adequate in all essential particulars.

The judgment of the District Court is affirmed.