### NEVILLE et al. v. AMERICAN BARGE LINE CO.

No. 186.

United States District Court
W. D. Pennsylvania.

June 18, 1952.

See also 12 F.R.D. 118, D.C., 105 F.Supp. 408.

Hymen Schlesinger, Pittsburgh, Pa., for libellant.

Clyde Armstrong, J. Roland Johnston, Thorp, Reed & Armstrong, Pittsburgh, Pa., for respondent.

STEWART, District Judge.

This is an action under the Jones Act, 46 U.S.C.A. § 688, to recover damages for injuries alleged to have been sustained by the libellant, Buelah L. Neville, as the result of the negligence of the respondent. The case was tried by the Court without a jury, and upon all the evidence, we make the following

### Findings of Fact

1. On June 9, 1950, the libellant, Buelah L. Neville, was employed by the respondent as a laundress on the motor vessel "Trade Winds".

2. The respondent is a corporation having an office for the transaction of business in the City of Pittsburgh, Pennsylvania.

3. The "Trade Winds" was a motor vessel with a total horsepower of 1400 and at all times herein mentioned was owned and operated by the respondent. It was

practically a new boat, having been commissioned during March, 1950, with a fully equipped galley.

4. The "Trade Winds" was enroute up the Ohio River with a tow of 14 barges on June 9, 1950, and at approximately 8:30 P.M. arrived in the vicinity of Lock No. 41, at or near Louisville, Kentucky.

5. By reason of the fact that at the time the "Trade Winds" arrived in the vicinity of Lock No. 41, another vessel proceeding down the river was in the process of going through the locks, it was necessary for the "Trade Winds" to wait for some time before entering the lock.

6. The Captain of the vessel, Lewis Enlow, who was at that time on duty as pilot, did not cause the vessel to be tied up to the shore or to the lock, but held the vessel in midstream by using enough power from the engines to counteract the current, thereby holding the vessel stationary in the river. That boat continued motionless in the river until the happening of the accident to the libellant, Buelah Neville. The boat did not strike any object and there was no jolt, jar or jerk to the boat which would have contributed to the accident hereinafter described.

7. The position of the boat was approximately 400 feet from the Kentucky shore and the head of the tow was approximately 200 feet below Sand Island. At the time of the accident, Captain Enlow had the boat's searchlights on, pointed toward Sand Island.

8. At approximately 9:20 that evening, the libellant, Buelah Neville, went to the galley, or kitchen, for the purpose of getting herself a cup of coffee. Notwithstanding that there were two pitchers filled with condensed milk (usually referred to in the testimony as cream) in an unlocked refrigerator in the dining room of the boat, Mrs. Neville proceeded to open a new can of milk or cream. Notwithstanding further that there were two types of hand can openers in the cutlery drawer in the galley, one of which was capable of being used to punch a hole in a can of milk, and a larger can opener fastened to a table in the galley, also capable of being used to punch a hole in a can of milk, Mrs. Neville used a meat cleaver for this purpose.

9. One of the hand can openers was of the ordinary type, having a pointed knife-like blade with which holes could be punched in a milk can, and the other was a rotary type ordinarily used to remove the entire top of a can. In addition, fastened to the table, was a large can opener of the rotary type, likewise customarily used for removing the entire top of a can, but capable of being used to punch a hole in a milk can.

10. When libellant attempted to open the can, the cleaver slipped and severely cut the first two fingers of her left hand.

11. Mrs. Neville immediately went to the room of the cook, Gladys Grubbs, who took Mrs. Neville into her bathroom and put the bleeding hand under water. The cook then summoned the libellant's son, Raymond Neville, who was employed on the boat as a deck hand and was sleeping in his room at the time.

12. Donald Ivy, a striker on the boat, saw Mrs. Neville walking through the engine room holding her hand in a peculiar fashion. He noticed several drops of blood on the floor, so he followed her to the cook's room. Seeing the seriousness of the situation, he went to the pilot house to summon the Captain.

13. In the pilot house with the Captain was Fred Hoyt, a steersman and the boat's clerk. When Ivy told them of the accident, the Captain immediately sent Hoyt to investigate, and when Hoyt found that the injury was serious, he returned to the pilot house and told Captain Enlow it was a matter for his attention. Meanwhile, the Captain, acting as pilot, had begun to work the boat up toward the foot of Sand Island, for the purpose of shoving the tow against the Island where it would be a rather simple operation within the qualifications of Hoyt, the steersman, to hold the boat and tow against the foot of the Island.

14. Having landed the tow against the Island at approximately 9:40 or 9:45, Captain Enlow went down to examine the libellant. Meanwhile, Raymond Neville, li-

bellant's son, had put a tourniquet on his mother's arm. The Captain loosened the tourniquet and observed the blood was not spurting, so he treated libellant's injury with merthiolate and instructed her son to watch the flow of blood and to tighten the tourniquet if she started to bleed profusely.

15. The Captain returned to the pilot house and called the Lock Master by radio telephone, and ordered a cab. He then maneuvered the boat over near the lock and had the libellant put ashore, in the company of Hoyt and her son and another member of the crew who needed medical treatment for another reason. The Captain gave Hoyt what is called a "hospital ticket", entitling the libellant to entry into and free treatment at the Nichols Hospital, a government institution in Louisville, Kentucky.

16. The libellant was taken off the boat and placed in the waiting taxi cab at about 10:00 o'clock.

17. Hoyt, Mrs. Neville, her son, Raymond Neville, and the other crew member arrived at the Nichols Hospital where Hoyt presented the hospital ticket to one of the attendants. Hoyt waited for approximately 20 minutes and then inquired of one of the hospital attendants whether he should stay, and was told he need not, whereupon he returned to the boat.

18. Mrs. Neville remained in the Nichols Hospital for about five days, when, at her request, she was transferred to the Holzer Hospital at Gallipolis, Ohio. She remained in that hospital for about five days. After she left the hospital, she returned every day for treatment for a period of three weeks, and then for another period of three to four weeks she went to the hospital for treatment every other day, and finally returned for treatment every three or four days.

19. On October 30, 1950, the libellant, Buelah Neville, was admitted to the Marine Hospital in Cleveland, Ohio. She remained in the hospital until December 16, 1950. She was readmitted on March 11, 1951, and discharged on April 20, 1951.

20. During the period the libellant spent in the Marine Hospital in Cleveland, Ohio, she was under the care of Dr. Mark E. Myers, Chief of the Surgical Service of that hospital.

21. Dr. Myers' opinion was that atrophy of the muscles of the left arm was caused by the disuse of the arm following the trauma and subsequent infection which had developed. A partial amputation of the index and long fingers was recommended. She was given treatment for her left shoulder consisting of manipulation under anesthesia, which broke up the adhesions, and 80 to 90 percent motion of the left shoulder was obtained in all directions. At the time of her discharge there was considerable improvement in the motion of the shoulder.

22. On November 24, 1950, the left index finger was amputated through the proximal phalanx, and at the same time capsulotomies were performed on the metacarpal phalangeal joints of the index and long fingers of the left hand. When the wounds were healed, she was discharged, viz., on December 16, 1950, and before leaving the hospital she was given instructions in exercises by the physiotherapist at the hospital and instructed to continue these exercises after she went home.

23. On March 26, 1951, Mrs. Neville's long middle finger was amputated through the distal end of the proximal phalanx.

24. She was discharged on April 20, 1951, with instructions to continue hand and finger physiotherapy at home.

25. During the period that Mrs. Neville was a patient at the Marine Hospital in Cleveland, Ohio, she underwent treatment for various other ailments, none of which bore any causal relation to the accident of June 9, 1950.

Conclusions of Law

1. This Court has jurisdiction of this suit under Section 33 of the Merchant Marine Act of 1920, commonly called the Jones Act, 46 U.S.C.A. § 688.

2. Section 33 expressly extends to a seaman who has suffered injuries during the course of his employment the right of action which the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. confers upon railway employees. Armit v. Loveland, 3 Cir., 1940, 115 F.2d 308.

3. Consequently, negligence is the basis of an injured seaman's action for damages under the Jones Act, Armit v. Loveland, supra; and our question here is not assumption of risk as counsel for respondent seems to urge, but rather whether the respondent was negligent. Roberts v. United Fisheries Vessels Co., 1 Cir., 1944, 141 F.2d 288. See also, Tiller v. Atlantic Coast Line Railroad Co., 1943, 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610.

4. The evidence in this case does not establish any negligence of the respondent which caused or contributed to the accident.

5. Further, the evidence in this case does not establish any unseaworthiness of the vessel "Trade Winds" which in any manner caused or contributed to the accident.

6. For these reasons, the libellant, Buelah Neville, is not entitled to recover damages from the respondent.

7. Likewise, since the right of the libellant John W. Neville to recover is contingent upon proof of a lawful claim by his wife, and since no such claim has been established in this case, the libellant, John W. Neville, is not entitled to recover damages from the respondent.

8. Therefore, judgment will be entered for the respondent.