**Don CHUY, Appellant in No. 77–1412**

**v.**

**The PHILADELPHIA EAGLES FOOTBALL CLUB (sued as "The Philadelphia Eagles"), Appellant in No. 77–1411**

**and**

**The National Football League.**

**Nos. 77–1411, 77–1412.**

United States Court of Appeals, Third Circuit.

Argued Nov. 29, 1977.

Reargued En Banc Nov. 6, 1978.

Decided March 9, 1979.

Marvin Comisky, Morris L. Weisberg, Norman Perlberger, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for appellant in No. 77–1412.

Leonard Schaeffer, Michael Brodie, James D. Rosen, Pechner, Dorfman, Wolffe,

Rounick & Cabot, Philadelphia, Pa., for appellant in No. 77–1411.

Argued Nov. 29, 1977.

Before GIBBONS and VAN DUSEN, Circuit Judges, and FISHER, District Judge.*

Reargued Nov. 6, 1978 In Banc.

Before SEITZ, Chief Judge, VAN DUSEN, ALDISERT, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.**

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents several interesting questions growing out of the employment by the Philadelphia Eagles Football Club ("the Eagles") of a former professional player, Don Chuy ("Chuy"). The unexpected and unfortunate termination of Chuy's employment evoked charges by him that the Eagles had not played the game according to the rules when Chuy blew the whistle terminating his football career. Chuy ultimately reduced those charges to an antitrust and diversity action in the United States District Court for the Eastern District of Pennsylvania.

I. BACKGROUND

Chuy joined the Eagles in 1969, having been traded from the Los Angeles Rams, another professional football club with which he had played for a half dozen years. On June 16, 1969, he met with the Eagles general manager, Palmer "Pete" Retzlaff, in Philadelphia, Pennsylvania, to negotiate a contract with the Eagles for the 1969, 1970, and 1971 football seasons. The parties concluded their negotiations by executing three National Football League (NFL) standard form player contracts on June 16, 1969, covering the 1969, 1970, and 1971 football seasons respectively at a salary of $30,000 for each season, with a $15,000 advance for the 1969 season.

The contracts each contained a standard NFL injury-benefit provision entitling a player injured in the performance of his service to his salary "for the term of his contract." Chuy sustained a serious injury to his shoulder during his first season in a game between the Eagles and the New York Giants in November, 1969. Sidelined for the remainder of the season, Chuy had to be hospitalized for most of December, 1969. During the hospitalization, his diagnosis revealed a pulmonary embolism, a blood clot in his lung, which marked the end of his professional athletic career. Following the advice of his physician, Chuy decided to retire from professional football and notified the Eagles of his intention. At the same time, Chuy requested that the Eagles pay him for the remaining two years of what he asserted was a three-year contract.

The Eagles requested that Chuy submit to a physical examination which Dr. Dick D. Harrell conducted in March, 1970. After extensive tests, Dr. Harrell concluded that Chuy suffered from an abnormal cell condition, presumably stress polycythemia, which may have predisposed him to the formation of dangerous blood clots. He therefore recommended to the Eagles that Chuy should "not be allowed to participate further in contact sports." Shortly after receiving Dr. Harrell's recommendation, General Manager Retzlaff informed Hugh Brown, a sports columnist for the Philadelphia Bulletin, that Chuy had been advised to quit football because of his blood clot condition. Brown thereupon telephoned Dr. James Nixon, the Eagles' team physician, for further information on Chuy's medical status.

On April 9, 1970, Hugh Brown's by-lined column in the Philadelphia Bulletin carried an account of Chuy's premature retirement. The column opened with the following:

> It's a jaw-breaker . . . Polycythemia Vera . . . and the question before the house is how Don Chuy, the Eagles' squatty guard, got hit with the jaw-breaker.

---

* Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation.

** Judge Adams was unable to sit with the court in banc because of injuries.

"One of the consequences of Polycythemia Vera," said Dr. James Nixon, the Eagles' physician, "is that the blood cells get in each other's way. It's a definite threat to form embolisms, or emboli." The remainder of the column quoted Retzlaff, Dr. Nixon, and Chuy's attorney concerning Chuy's medical condition and his effort to obtain compensation for the additional two years of his putative three-year contract. The Associated Press wire service picked up the story and articles appeared the next day in newspapers throughout the country, including the Los Angeles Times. The articles reported that Chuy had been "advised to give up football and professional wrestling because of a blood condition" and that, according to Dr. James Nixon, the Eagles' physician, "Chuy is suffering from polycythemia vera. Nixon said it is considered a threat to form blood clots."

After reading the Los Angeles Times article, Chuy testified that he panicked and immediately called his personal physician, Dr. John W. Perry. Dr. Perry informed Chuy that polycythemia vera was a fatal disease but that, from his records, Chuy did not have that disease. Dr. Perry added that he would run a series of tests to confirm his diagnosis. Chuy testified that he became apprehensive, despite Dr. Perry's assurances, broke down emotionally, and, frightened by the prospect of imminent death, refused to submit to any tests. Chuy stated that for the next several months, he could not cope with daily routines and he avoided people. He returned to Dr. Perry, who gave him numerous tests which disproved the presence of polycythemia vera. Nonetheless, Chuy testified that he continued to be apprehensive about death and that marital difficulties also developed.

Chuy eventually brought suit against the Eagles and the National Football League, alleging antitrust violations, breach of contract, intentional infliction of emotional distress and defamation. The district court dismissed the antitrust claim, 407 F.Supp.

717 (E.D.Pa.1976), and the dismissal has not been appealed. The court submitted the remaining claims to the jury by special interrogatories, and the jury returned a verdict for the plaintiff. On the basis of the jury's findings, the district court molded a damages award for breach of contract in the amount of $45,000, which reflected $60,000 salary due for the 1970 and 1971 seasons, less a $15,000 debt Chuy owed the Eagles. The jury also awarded Chuy $10,000 compensatory damages for the intentional infliction of emotional distress claim and punitive damages in the sum of $60,590.96. On the defamation claim, the jury found in its answer to the special interrogatories that Dr. Nixon's statements tended to injure Chuy's reputation, but that the columnist, Hugh Brown, did not understand that the publication of the doctor's statements would harm Chuy's reputation. The district court thereupon entered judgment against Chuy on his defamation claim.

After the entry of judgment against the Eagles in the aggregate sum of $115,590.96, both parties filed post-trial motions seeking either judgment notwithstanding the verdict (judgment n. o. v.) or a new trial. The Eagles addressed their motions to the contract and intentional infliction of emotional distress claims. Chuy's motion sought a new trial on the defamation claim. The district court denied all post-trial motions and both parties have appealed. We affirm.[1]

## II. BREACH OF CONTRACT

The Eagles contend, as they did in the district court, that the three contracts Chuy signed with them on the same day were on their face three *separate*, consecutive, one-year contracts. They assert that the contracts for the 1970 and 1971 seasons required that Chuy comply with paragraph 6, which provides for a complete physical examination of the player at the start of each training session during the term and the right of the "Club" to terminate the con-

---

1. The Eagles' appeal and Chuy's cross-appeal were initially heard by a panel of this court. The court ordered the judgment of the original panel to be vacated and the case reheard by the court in banc.

tract if the "Player" fails to establish his excellent physical condition to the satisfaction of the Club physician. The Eagles' position is that in the absence of a "no-cut" or "no-release" provision for the 1970 and 1971 seasons, Chuy was entitled only to the balance of his salary under the 1969 season contract. They argue that the district court should have given effect to this unambiguous construction of the contract without resort to parol evidence of the parties' intent and understanding.[2]

Judge Becker, however, concluded that the three written contract forms signed by Chuy and the Eagles were reasonably susceptible to ambiguity in the meaning of the phrase "term of this contract" as used in paragraph 14 thereof and that when the contracts were read together, paragraph 14 was "highly ambiguous." He decided that the jury should resolve the ambiguity on the basis of pertinent parol evidence. The jury found that under the established practice in the NFL, a club is not relieved of liability for salary in subsequent seasons covered by a "multiple" contract by which a player signs documents on the same day generally relating to successive football seasons, if the player sustains an injury in one season and is unable to perform by reason of that injury in subsequent seasons.[3]

We must first determine whether the district court erred as a matter of law in submitting to the jury the task of ascertaining the obligations of the parties under the three documents they executed on June 16, 1969. The cardinal rule of contract construction is that the intent of the parties at the time they contracted is controlling. *Kennedy v. Erkman*, 389 Pa. 651, 655, 133 A.2d 550, 552 (1957). Under Pennsylvania law,[4] the intent of the contracting parties is exclusively determined from the

written instrument if its words are "clear and unambiguous." *Id.*; see *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 205 A.2d 865 (1965); *United Refining Co. v. Jenkins* 410 Pa. 126, 189 A.2d 574 (1963). However, when the language of the written contract is ambiguous, extrinsic or parol evidence is admissible to resolve the ambiguity. *In re Herr's Estate*, 400 Pa. 90, 94, 161 A.2d 32, 34 (1960); *Kennedy v. Erkman, supra*; *Castellucci v. Columbia Gas, Inc.*, 226 Pa.Super. 288, 292, 310 A.2d 331, 333 (1973). Although the interpretation of a written contract that is clear and unambiguous is for the court, *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 394 Pa. 124, 145 A.2d 672, 676 (1958), once the court determines that parol evidence is pertinent to the construction of an ambiguous contract; it is for the jury to resolve the ambiguities and find the parties' intent. *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 35–36, 137 A.2d 332, 336 (1957); *Castellucci v. Columbia Gas, Inc., supra* 226 Pa.Super. at 294, 310 A.2d at 334.

The term of coverage and compensation per season are determinative of Chuy's entitlement under paragraph 14 of the contract, which provides that in the event of injury:

> . . . the Club will . . . (2) continue, during the *term* of this contract, to pay Player his salary as provided in ¶ 3 . . . if and so long as it is the opinion of the Club Physician that Player, because of such injury, is unable to perform the services required of him by this contract. (*Emphasis supplied.*)

Chuy claims compensation under paragraph 14 for the 1970 and 1971 seasons. The Eagles, having construed each contract as a single-year agreement, respond that only

---

**2.** The jury found, in response to an interrogatory, that Chuy was unable to play football for the Eagles during the 1970 and 1971 seasons because of the injuries he sustained while playing during the 1969 season. The Eagles do not challenge this finding.

**3.** The jury found that Chuy and the Eagles intended during the negotiating session on June 16, 1969, that if Chuy sustained a football-relat-

ed injury in 1969 which rendered him incapable of playing football during the 1970 and 1971 seasons, the Eagles would be liable to Chuy for salary for 1970 and 1971.

**4.** The parties executed the documents in Pennsylvania and it is undisputed that the law of that state applies to the construction of the contract.

the 1969 season's contract was in effect at the time of Chuy's injury and that their obligation to him is limited to that contract solely.[5]

The standard player contract adopted by the professional football leagues sets forth the respective obligations of the player, club and league. The only provisions requiring individualized negotiation and agreement are the term of the contract and the amount of compensation.[6] Blanks appear on the form for the parties to complete the termination date of the contract and the amount of compensation payable for each football season during the term of the contract. On one form signed by Chuy, the termination date indicated in paragraph 1 was the first of May following the close of the 1969 football season; on the others, the years 1970 and 1971 were respectively inserted. On each form the amount of $30,-000 was entered in the blank space in paragraph 3.

■ Because the date of execution for each contract was June 16, 1969, the plain meaning of paragraph 1 of the contracts, as executed, was to create respectively a one-year contract for the 1969 season, a two-year contract for the 1969 and 1970 seasons, and a three-year contract for the 1969–1971 seasons. Such overlapping terms of coverage rendered paragraph 14 in the executed documents ambiguous. Thus, we cannot say that the district court erred in admitting parol evidence to clarify the intent of the parties as to the term of their contract and the applicability of paragraph 14's provision to Chuy's claim for compensation. Moreover, under well-settled Pennsylvania law, the trial court properly submitted to the jury the question of the parties' intent.

The Eagles rely heavily on *Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160 (S.D.N.Y.1973), where the district court had before it for construction standard form player contracts which were identical to those here and which raised a similar issue. The court had to determine whether a player injured in 1969 was entitled to recover his salary for the 1970 season under the injury-benefits clause in view of his simultaneous execution of three separate contracts covering the 1968, 1969, and 1970 football seasons. It held that the intent of the parties clearly revealed that each season's contract was discrete and distinct and rejected the player's contention that he had entered into one three-year contract, notwithstanding the execution of three separate contracts. It therefore denied as a matter of law the plaintiff's claim for salary for the remaining season following his injury. In *Sample*, however, as confirmed by letter of the Eagles' counsel to this court, the printed terms of paragraph 1 had been altered in the form contract. The parties had stricken the words "the date of execution hereof" and had entered in handwriting for the 1969 season the date "May 2, 1969" and in the contract for the 1970 season the date "May 2, 1970." These interpolations, although brief, were sufficient to relieve the contracts from ambiguity as to their term. Had the contracts before us borne similar emendations, we also might have deemed them unambiguous.

■ The jury heard testimony from the principals concerning the negotiations on the eventful day the documents were signed. Chuy recounted that he had re-

---

**5.** The Eagles argue in their briefs to this court that unlike a "no-cut" or "no-trade" contract, the three documents signed by Chuy required him to report each season to training camp, to pass the physical examination and to perform satisfactorily during each season in order to become entitled to his salary for a given season.

**6.** A standard player contract form provides in pertinent part:

1. The term of this contract shall be from the date of execution hereof until the first

day of May following the close of the football season commencing in the calendar year 19——, subject, however, to termination, extension or renewal as specified herein.

＊　＊　＊　＊　＊　＊

3. For: the Player's services as a skilled football player during the term of this contract: . . . the Club promises . . . to pay the Player each football season during the term of this contract, . . . the amount of ——.

quested a three-year, "no-cut, no-trade" contract for an aggregate sum of $100,000.00 and an advance of $15,000.00. He testified that Retzlaff countered with a three-year contract which he described as an attractive "$90,000 package," including the $15,000 advance, but rejected the no-cut, no-trade proposal. On the other hand, Retzlaff denied that Chuy had ever requested a three-year package or a $100,000 package. He testified that he pointed out to Chuy that the latter came to the Eagles still under an existing contract at $25,000 signed with the Los Angeles Rams, but to encourage Chuy in coming to Philadelphia he agreed to renegotiate and offered him $30,000 for 1969 and for each year after that. The jury, in response to the special interrogatories, found that both Chuy and Retzlaff "manifested by words an intent" to have the Eagles liable for salary to Chuy for 1970 and 1971 in the event he sustained a football-related injury in 1969 which rendered him incapable of playing in 1970 and 1971.[7]

On an appeal from a denial of a motion for judgment notwithstanding the verdict, this court must view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict. *Kademenos v. Equitable Life Assurance Society*, 513 F.2d 1073, 1074 (3d Cir. 1975). Our limited function at this point is to ascertain from a review of the record whether there is sufficient evidence to sustain the verdict of the jury on this issue. After reviewing the pertinent trial testimony, we conclude there is sufficient evidence from which the jury could have found that the parties intended to compensate Chuy for three years for any football-related disability crippling his career. We therefore find no error in the district court's denial of Eagles' motion for judgment n. o. v. on Chuy's contract claim.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Plaintiff's recovery of damages for emotional distress, stemming from having read Dr. Nixon's statement that Chuy was suffering from polycythemia vera, was predicated upon the principle enunciated in section 46 of the Restatement (Second) of Torts (1965). That section provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Thus, there are four elements to the action under § 46: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. Although the Pennsylvania Supreme Court has not as yet specifically adopted in its entirety the Restatement's formulation and comments, Pennsylvania courts have signalled their acceptance of this evolving tort. *Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970);[8]

---

**7.** The Eagles strenuously argue that the trial judge erred in refusing to let the jury have the opportunity of examining the three contractual documents signed by the parties during their deliberations. The judge reasoned that to do so might have suggested to the jury that they should answer the interrogatories solely on the basis of the contract language. He chose to inform the jury of the nature of the contractual ambiguity and directed them not to construe the written documents, but to determine the intent of the parties from the parol evidence. Although we believe it would have been preferable to permit the jury to examine the documents under proper instructions, we cannot say the district court committed reversible error in the course he adopted.

**8.** In *Papieves*, the complaint brought by distraught parents alleged that the defendant's automobile struck their son and that the defendant, a minor, instead of notifying the police or the parents of the boy, hid the body and later buried it in a makeshift grave. The Pennsylvania Supreme Court overruled the dismissal of the complaint on a demurrer, holding that "recovery may be had for serious mental or emotional distress directly caused by the intentional and wanton acts of mishandling a decedent's body which are here alleged." 437 Pa. at 379, 263 A.2d at 121. The court explicitly relied in part on § 46 of the Restatement (Second) of Torts. However, because of the procedural posture of the case and its extraordinary facts, the court did not have the oppor-

*Forster v. Manchester,* 410 Pa. 192, 189 A.2d 147 (1963); *Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 368 A.2d 770 (1976). In light of the extant case law, we believe that the black letter rule of § 46 of the Restatement, along with the interpretive comments, may be applied as the basis in Pennsylvania law for the tort of intentional infliction of emotional distress.

The Eagles argue that the district court should not have submitted to the jury the question whether Dr. Nixon's statements constituted "extreme and outrageous conduct"; that the court gave improper instructions concerning the intent necessary for the tort and that there was insufficient evidence for the jury to find the requisite intent; that Chuy's allegedly exaggerated and unreasonable reaction to Dr. Nixon's remarks precludes the Eagles' liability; and that the Eagles cannot be vicariously liable even if Dr. Nixon intentionally or recklessly caused Chuy severe emotional distress.

▪ The Eagles contend first that the trial judge erred in submitting to the jury the issue whether Dr. Nixon's statements constituted "extreme and outrageous conduct." They assert that an actor's conduct must be examined as a matter of law by the court *in limine.* Comment h to § 46, upon which the Eagles rely, divides the functions of the court and jury in a conventional manner.[9] The court must determine, as a matter of law, whether there is sufficient evidence for reasonable persons to find extreme or outrageous conduct. If the plaintiff has satisfied this threshold evidentiary requirement, the jury must find the facts and make its own characterization. The

district court followed precisely the Restatement's procedure.

▪ In applying the legal standard for sufficiency of the evidence to support a finding of extreme and outrageous conduct, the district court correctly ruled that if Dr. Nixon advised sportswriter Brown that Chuy suffered from polycythemia vera, knowing that Chuy did not have the disease,[10] such conduct could reasonably be regarded as extreme and outrageous. According to comment d of the Restatement, it has not been sufficient for a finding of liability that "the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice.'"

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts, § 46, comment d.

Accepting as we must at this stage Chuy's version of the events, we have a statement to the press by a physician assumed to know the facts that a person is suffering from a potentially fatal disease, even though the physician was aware that the person was not stricken with that condition. This, of course, constituted intolerable professional conduct. Disseminating the falsehood through the national press compounded the harm. Surely Dr. Nixon's statements, as understood by the jury, went beyond the "mere insults, indignities . .

---

tunity to define further the scope of this newly recognized tort.

**9.** Restatement (Second) of Torts § 46, comment h, reads in full:

> h. *Court and jury.* It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the

court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

**10.** We recognize that Dr. Nixon testified that he never told Brown of a positive diagnosis of polycythemia vera and that he only suggested that Chuy may have suffered from a polycythemia, a non-fatal blood condition. The jury, however, believed Brown's recollection of the phone conversation with Dr. Nixon. We are bound to accept the jury's finding.

or annoyances" which people are prepared to withstand.[11]

■■■ The Eagles next contend that the district court erred in charging the jury on intent and recklessness. Section 46 does not recognize liability for mere negligent infliction of emotional distress. *See Conway v. Spitz*, 407 F.Supp. 536 (E.D.Pa.1975). However, reckless conduct causing emotional distress renders an actor as liable as if he had acted intentionally. *See* comment i to § 46.[12] To facilitate the jury's answer to the interrogatories, the trial judge gave instructions on the elements of the tort of infliction of emotional distress. With respect to requisite intent, he stated that the plaintiff could prevail only if the jury found (a) that Dr. Nixon's statement was intentional and (b) that the natural and probable consequences of making the statement were that it would become known to Chuy and that such awareness would cause him emotional distress.[13]

As we understand the Eagles' argument, unless Dr. Nixon was aware that his comments were substantially certain to cause Chuy severe emotional distress, his remarks cannot be found to be "reckless." We are persuaded, however, that if Dr. Nixon's statements were intentional, he need not have been *aware* of the natural and probable consequences of his words. It is enough that Chuy's distress was substantially certain to follow Dr. Nixon's rash statements. Intentionally to propagate a falsehood, the natural and probable consequences of which

will be to cause the plaintiff emotional distress, is equivalent, in the language of the Restatement's comment i, to the "deliberate disregard of a high degree of probability that the emotional distress will follow." Thus, the district court's instruction comported with the Restatement's requirements for recklessness.

Having been properly charged, the jury reasonably could have found that the requirements of section 46 as to intent had been met. The testimony given by Brown sufficiently supported a finding that Dr. Nixon's remarks were reckless.

■■■ Beyond the characterization of Dr. Nixon's statement as reckless and outrageous, the Eagles assert that Chuy's reaction to the statement was exaggerated and unreasonable. The Eagles point to evidence that Chuy, after reading the statement attributed to Dr. Nixon in the local newspaper, refused to undergo tests which he had been advised would disprove the presence of polycythemia vera. Nor did Chuy attempt to communicate with Dr. Nixon or Dr. Harrell to verify the newspaper account of his illness. Instead, Chuy became depressed and despondent, delaying tests for a period of six months. The Eagles assert that Chuy's failure to secure prompt medical verification of his putative illness was unjustified, precluding liability for the infliction of emotional distress.

Comment j to § 46 requires that a plaintiff prove that he suffered severe distress that is not unreasonable, exaggerated, or

---

11. By analogy, illustration 1 to § 46 of the Restatement supports liability here:

1. As a practical joke, A falsely tells B that her husband has been badly injured in an accident, and is in the hospital with both legs broken. B suffers severe emotional distress. A is subject to liability to B for her emotional distress. If it causes nervous shock and resulting illness, A is subject to liability to B for her illness.

If A is liable for playing that joke, a fortiori, liability seems justifiable if a doctor falsely or recklessly makes it known to a person that he is suffering from a fatal disease.

12. Comment i reads: *"Intention and recklessness.* The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that

such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow."

13. The district court explained the tort in these precise words:

So if you intentionally make a statement the natural and probable consequences of which it will be known to the person and cause him or her emotional distress and if the making of that statement is shocking and outrageous and exceeds the bounds of decency with respect to its natural and probable impact, then a case of intentional infliction of emotional distress is made out.

unjustified. The same comment further notes that severe distress may encompass mental anguish, fright, horror, grief, worry, and other emotional disturbances. The extent of the severity is to be measured by whether any "reasonable man could be expected to endure it." Restatement (Second) of Torts, § 46, comment j. The jury in this case was asked to determine whether the "natural and probable" impact of Dr. Nixon's statements rendered the statements beyond the bounds of decency and it responded affirmatively. Thus, implicit in the jury's affirmative answer is its determination that a person of ordinary sensibility could not have withstood the distress without severe mental anguish and that Chuy did not feign his mental anxiety.

None of the cases cited by the Eagles requires as an element of the cause of action that the victim of infliction of emotional distress seek to alleviate that distress by immediate medical treatment or verification.[14] The district court instructed the jury that if they found that Chuy unreasonably failed to minimize his injuries, they could accordingly reduce his damage award. We believe these instructions correctly distinguished between the severity of distress as an element of liability and the failure of the victim reasonably to mitigate damages. The jury therefore was properly instructed on the significance of Chuy's reluctance to undergo extensive medical testing after sustaining emotional distress.

 Even assuming, arguendo, that Dr. Nixon committed a tort, the Eagles contend they should not have been held vicariously liable as a master responsible for the torts of a servant. Under Pennsylvania law, a master-servant relationship is established if the employer had the power to control and direct the conduct of the employee. A master is liable for the torts of his servant if the latter's tortious conduct was within the scope of his employment, i.

e., conduct performed to further the business of the employer and not for the servant's personal purposes. Norton v. Railway Express Agency, Inc., 412 F.2d 112, 114 (3d Cir. 1969); Mauk v. Wright, 367 F.Supp. 961, 965–66 (M.D.Pa.1973). The existence of a master-servant relationship and conduct without the scope of employment are factual issues for the jury. Norton, supra; Anzenberger v. Nichols, 413 Pa. 543, 198 A.2d 309 (1964).

The jury in this case specifically found that the Eagles had the right to control and actually did control the substance of Dr. Nixon's statements to the press concerning the physical condition of the team's players. Although the Eagles may be correct that Dr. Nixon performed his surgical duties as an independent contractor immune from team control, the jury was properly instructed to focus only on Dr. Nixon's role as press spokesman about players' medical status. There was ample evidence that in this limited function, Dr. Nixon was subject to control by team officials. Moreover, the frequency of Dr. Nixon's performance of this role established that he did it within the scope of his employment.

We conclude that the district court properly rendered a verdict against the Eagles, holding them vicariously responsible for Dr. Nixon's tortious statement to Brown. In so doing, we reject any suggestion by the Eagles that the master, to be held liable for this tort, must either participate in it or exhibit scienter.

## IV. PUNITIVE DAMAGES

The district court instructed the jury that it could award punitive damages as a penalty to the defendant and as a deterrent to others who might be likeminded, if the jury concluded that such damages were appropriate. The Eagles advance several grounds for rejecting the jury's award of

---

14. For example, in Forster v. Manchester, supra, cited by the Eagles, a woman, who was expected to file a suit alleging injuries from an automobile accident was subjected to surveillance in public places in order to determine the extent of her injuries. In denying recovery for the emotional distress caused by the surveillance, the Pennsylvania Supreme Court did not deny the reasonableness of the victim's reaction but rather excused the defendant's conduct as socially valuable and reasonable, and hence not outrageous.

punitive damages in this case. First, they, contend that punitive damages cannot be awarded for a § 46 tort because the liability-producing conduct must be extreme and outrageous by definition. Enhancing a verdict with punitive damages would in their view be a form of double punishment for an offense which is compensable at all only because of its outrageous nature. *Eckenrode v. Life of America Insurance Co.*, 470 F.2d 1, 5 (7th Cir. 1972) (punitive damages denied because "the outrageous quality of the defendant's conduct forms the basis of the action" and compensatory damages sufficiently punitive). Second, the Eagles argue that punitive damages were improperly imposed upon the principal for the torts of its agent. Third, the Eagles contend that the jury was improperly instructed on the measurement of punitive damages and that the amount levied was excessive in comparison with the compensatory award.

Pennsylvania courts recognize the standards governing punitive damages set forth in § 908 of the Restatement of Torts (1939). *Medvecz v. Choi*, 569 F.2d 1221, 1226 (3rd Cir. 1977). *See Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963); *Hughes v. Babcock*, 349 Pa. 475, 480–81, 37 A.2d 551, 554 (1944).

Punitive damages, as defined by section 908(1) of the Torts Restatement, are damages other than compensatory or nominal, "awarded against a person to punish him for his outrageous conduct." We see no inconsistency in awarding punitive damages by the same legal standard used in determining liability for compensatory damages. The purposes of the two forms of damages are quite distinct under Pennsylvania law. This court, in applying Pennsylvania law, recently enunciated the purposes of punitive damages in tort actions:

> The question in medical malpractice cases, as in tort actions generally, is whether there has been sufficiently aggravated conduct contrary to the plaintiffs' interests, involving bad motive or reckless indifference, to justify the spe-

cial sanction of punitive damages. That sanction serves the dual function of penalizing past conduct constituting an aggravated violation of another's interests, and of deterring such behavior in the future.

*Medvecz v. Choi, supra* at 1227. *See also Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255, 263 (E.D.Pa.1976). This being so, predicating compensatory damages upon a finding of outrageous conduct does not preclude a separate assessment of punitive damages to punish past and deter future tortious conduct.

Punitive damages are commonly awarded in cases of intentional torts. There is nothing peculiar about the tort of infliction of emotional distress that should limit its victims only to compensatory damages. The Restatement of Torts explicitly justifies the award of both punitive and compensatory damages for an analogous tort:

> [I]n torts which, like malicious prosecution, require a particular anti-social state of mind, the improper motive of the tortfeasor is both a necessary element in the cause of action and a reason for awarding punitive damages.

Restatement of Torts, § 908, comment c.

We acknowledge that not all states recognizing a tort for infliction of emotional distress allow an award of punitive damages. *Compare Eckenrode v. Life of America Insurance Co.*, 470 F.2d 1, 5 (7th Cir. 1972) (punitive damages not sanctioned under Illinois Law), *with Fletcher v. Western National Life Insurance Co.*, 10 Cal.App.3d 376, 404, 89 Cal.Rptr. 78, 95 (1970) (punitive damages sanctioned under California law). It is our task to anticipate how the Pennsylvania Supreme Court would rule on this matter. In light of the noncompensatory purposes promoted by punitive damages in tort actions generally under Pennsylvania law, we believe Pennsylvania courts would sanction an award of punitive damages in appropriate cases of tortious infliction of emotional distress.[15] *Cf., Richette v. Solo-*

---

15. We do not suggest that in every case of proven liability under § 46 of the Restatement

(Second) of Torts punitive damages are proper. Although the underlying conduct must be out-

*mon,* 410 Pa. 6, 187 A.2d 910 (1963) (upholding award of punitive damages in suit for intentional interference with prospective business advantage).

The Eagles argue that, as a general rule, punitive damages should not be assessed against a principal who does not participate in or approve the tortious conduct of his agent. The rationale suggested is that damages designed to punish wrongdoers, rather than make victims whole, should be assessed only against parties personally responsible for tortious conduct. The Eagles assert that, on the facts of this case, they were innocent of wrongdoing in regard to Dr. Nixon's statements. In the absence of managerial participation in or approval of Dr. Nixon's statements, the Eagles claim that punitive damages in the nature of a penalty were inappropriate.

The Eagles rely on § 909 of the Restatement of Torts, adopted as § 217C of the Restatement (Second) of Agency (1958), which circumscribes the scope of an employer's or principal's liability for punitive damages.[16] Although no Pennsylvania cases have been cited which apply this provision, we do not write on a clean slate. In *Skeels v. Universal C. I. T. Credit Corp.,* 335 F.2d 846 (3d Cir. 1964), this court, in a diversity action, considered whether Pennsylvania adhered to the rule of § 909 of the Restatement of Torts limiting an employer's exposure to punitive damages for the torts of his employee. Judge Hastie, in reviewing the state court precedents, concluded that Pennsylvania followed the "less restrictive" rule enunciated in *Lake Shore & Michigan Southern Railway v. Rosenzweig,* 113 Pa. 519, 544, 6 A. 545, 553 (1886), that a corpo-

ration is liable for exemplary damages for the acts of its servant, acting within the scope of his authority. *Skeels v. Universal C. I. T. Credit Corp., supra* at 852. *Accord, Philadelphia Traction Co. v. Orbann,* 119 Pa. 37, 12 A. 816 (1888); *Gerlach v. Pittsburgh Railways,* 94 Pa.Super. 121 (1928).

Judge Hastie recognized the potential harshness of this rule and concluded for the court that "the conduct of the agent who inflicts the injury complained of must be rather clearly outrageous to justify the vicarious imposition of exemplary damages upon the principal." 335 F.2d at 852. We are persuaded to follow Judge Hastie's analysis in reviewing the record in this case.

We note that the Eagles did not request, and so were not refused, an instruction delineating a narrow compass for the award of punitive damages against an employer for the intentional torts of his employee. The Eagles requested, pursuant to Fed.R. Civ.P. 51, an instruction on punitive damages which did not mention a special standard for vicarious liability. Rather, the instruction would have required the jury to find that the act of making the statements was done with a bad motive or reckless indifference to others. The instruction did not request the jury to determine whether the Eagles' management participated in or approved the reckless acts. The district court informed the parties that it would cover the defendant's request for a charge on punitive damages in its instructions. The actual instruction to the jury accurately reflected Pennsylvania law stated above. The jury was instructed to award in its discretion punitive damages as a penalty and deterrent for "dereliction and malice."

rageous to sustain liability, the factfinder may conclude, on the record in a particular case, that exemplary damages would not be warranted. Restatement of Torts, § 908(2) (1939). The factfinder must consider whether the function of punitive damages would be well served in light of all the circumstances, including the character of the act, the motive of the tortfeasor, and the relation between the parties. *See Chambers v. Montgomery,* 411 Pa. 339, 345, 192 A.2d 355, 358 (1963).

**16.** Section 909 provides:

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

(a) the principal authorized the doing and the manner of the act,

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the employer or a manager of the employer ratified or approved the act.

In deciding that Dr. Nixon's statements were extreme and outrageous, the jury found a basis for the underlying cause of action, as well as a punitive award. In light of this court's prior construction of Pennsylvania law in *Skeels v. Universal C.I.T. Credit Corp., supra,* punitive damages could properly have been assessed against either Dr. Nixon or the Eagles.

In sum, we believe that Pennsylvania courts would adopt a standard of vicarious liability for punitive damages which would encompass the conduct of Dr. Nixon found by the jury to be outrageous. The award of such damages is properly left to the jury as factfinder. The jury in this case made such an award on the basis of instructions consistent with those proposed by the defendants and in accord with governing Pennsylvania law.

■■■■ One further objection to the award of punitive damages concerns the amount. The Eagles contend that the award of $60,590.96 was both excessive and improperly reflective of Chuy's contract claim. Comment e to § 908 of the Restatement of Torts provides that the trier of fact, in assessing damages, may consider all circumstances, including the motives of the wrongdoer and the relationship between the parties. In addition, Pennsylvania courts require that punitive damages not be disproportionate to the amount of compensatory damages. *Hughes v. Babcock,* 349 Pa. 475, 481, 37 A.2d 551, 554 (1944).

Although the punitive damages awarded were more than six times the compensatory damages, we do not order a reduction of the punitive recovery. The jury had before it evidence concerning the Eagles' management's disdain for Chuy's contractual claims

and the team president's remarks about Chuy.[17] The contract dispute and the tort claim, although distinct causes of action in the context of liability, are interwoven and bear on the relations between the parties at the time the harmful statements were made. Thus, we believe that the jury could have considered the conduct of the Eagles' management in resisting Chuy's efforts to receive three years' pay in calculating the award.[18] In view of the unusual circumstances of this case and giving the plaintiff the benefit of all inferences to which he is now entitled, we are unable to conclude that the district court erred in not reducing the jury's award of punitive damages.[19]

## V. DEFAMATION

Plaintiff has appealed the district court's denial of his motion for a new trial on the defamation count of the complaint. On the basis of the jury's answers to pertinent interrogatories, the district court molded a verdict against plaintiff, denying him recovery for injury to his reputation caused by the allegedly defamatory content of Dr. Nixon's statements recited in Brown's April 9, 1970 column.

■■■■ The jury found, in answer to a specific interrogatory, that the plaintiff proved by clear and convincing evidence that Dr. Nixon intentionally told Brown that Chuy was suffering from polycythemia vera. The court also asked the jury to determine whether all of Dr. Nixon's statements mentioned in the newspaper article, when taken together, tended to injure Chuy's reputation, and the jury answered affirmatively. Finally, the jury was asked whether news columnist Brown understood that publica-

---

17. A secretary in the Eagles' front office, Mrs. Gloria Jurgelewicz, testified that she remembered that Leonard Tose, Eagles' president, had said, in reference to Chuy, "There is no way in hell we are going to pay him that money, the remainder of his contract."

18. The Eagles can point neither to an error in the district court's instruction as to calculation of amount of punitive damages nor to any refusal by the district court to give an instruction requested pursuant to Rule 51.

19. We have no evidence that the jury actually calculated the punitive damage award to equal Chuy's contract claim. Of course, it is well accepted that a court will not inquire into the calculation methods employed by the jury during its deliberations. When a damage award is not liquidated or susceptible to a mathematical formula, courts are reluctant to disturb the resultant measure. *Armit v. Loveland,* 115 F.2d 308, 314 (3d Cir. 1940).

tion of Dr. Nixon's statements would tend to injure Chuy's reputation. The jury responded to this specific interrogatory in the negative. Because Pennsylvania law requires that the recipient understand the communication as defamatory for liability to exist, *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971); Pa.Stat.Ann. tit. 12 § 1584a(d), the response to the last interrogatory compelled the court to enter the verdict for the defendant on this issue. Although we affirm the judgment, we reach this result because we believe the remarks in question were not defamatory as a matter of law and the issue should not have gone to the jury.

■ To prove a case of defamation, Chuy needed first to show that Dr. Nixon's remark was capable of defamatory meaning,[20] and whether he had made this showing was a matter for the court to decide. In reaching a decision on the question, the court, as a matter of federal constitutional law, had to apply a standard of proof based on Chuy's public status. The United States Supreme Court has established these standards of proof in response to two competing principles: the need to protect personal reputation, and the need for a vigorous and uninhibited press that will serve the strong public interest in learning about public figures. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1976).

Beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the United States Supreme Court has enunciated various federal constitutional rules which protect first amendment interests and which limit in several respects state causes of action for defamation. The rule to be applied depends in part upon characterization of the plaintiff as either a public official, public figure, or private person. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1976), the Supreme Court described two types of public figures. Some individuals of "pervasive fame or notoriety" are public figures in all contexts. *Id.* at 351, 94 S.Ct. at 3013. Alternatively, "an individual injects himself or is drawn into a public controversy and thereby becomes a public figure for a limited range of issues." *Id.*

■ Professional athletes, at least as to their playing careers, generally assume a position of public prominence. Their contractual disputes, as well as their athletic accomplishments, command the attention of sports fans. Chuy, in particular, was a starting player for the Eagles. He had gained special prominence for being involved in a major and well-publicized trade in which his contract was assigned from the Los Angeles Rams to the Eagles. His injury was sustained on the field and led to discovery of a physical condition which forced his retirement. With all this as background, Chuy's dispute with the Eagles in the 1970 offseason concerning payment of two years' salary was no mere private contractual matter. Chuy had been thrust into public prominence long before Dr. Nixon's statements appeared in the April, 1970 Bulletin and we have no difficulty in concluding as a matter of law that he was a public figure. The article, which discussed Chuy's physical condition, his contractual dispute, and his retirement, clearly concerned a man who was a public figure, at least with respect to his ability to play football.[21]

---

**20.** The Pennsylvania Supreme Court has adopted the definition of a defamatory communication as enunciated in the First Restatement of Torts:

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

*Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971), *quoting* Restatement of Torts § 559 (1938).

**21.** We believe that Chuy's public prominence was a good deal more marked than the status of the plaintiff in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The former Mrs. Firestone was found not to have attained a role of prominence in affairs of society and her divorce action was deemed not a public controversy. *Id.* at 453–54, 96 S.Ct.

Because Chuy is a public figure, this may require that he prove by "convincing clarity" that Dr. Nixon's statement was capable of defamatory meaning. This is the standard enunciated in *New York Times Co. v. Sullivan, supra,* for proof of actual malice required of a public figure. Without deciding whether the evidence of defamatory content should be measured by that standard or one less stringent, we are satisfied that Chuy failed to prove defamation.

 Under Pennsylvania law, the question of whether a publication is capable of defamatory meaning is for the court in the first instance, and not for the jury. *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 496, 502 (3d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (Pa.1971). We must be governed, in ascertaining whether a particular form of words is capable of defamatory meaning by the standard announced in Restatement of Torts, § 559 (1938), which the Pennsylvania courts have adopted. *See Cosgrove Studio & Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751, 753 (1962). Section 559 of the Restatement provides:

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

 We have carefully scrutinized the comment attributed to Dr. Nixon that Chuy suffered from polycythemia vera. We perceive no basis for Chuy's contention that it is a "loathesome disease" which should be treated as defamatory per se. Liability for imputing to another an existing loathesome disease must, according to the Restatement (Second) of Torts § 572, "be limited to diseases that are held in some special repugnance . . . ." The decided cases concerned with loathesome disease have limited the term to sexually communicable venereal disease and leprosy. Polycythemia vera is a disease of unknown cause characterized by increased concentration of hemoglobin and a great absolute increase in red cells attended by an enlargement of the spleen. It is neither contagious nor attributed in any way to socially repugnant conduct.

We have also examined Brown's article to determine whether there is any context in which the imputation of his physical disease might be considered defamatory. Dr. Nixon's medical evaluation of Chuy's condition consists of several sentences attributed to him, the sum and substance of which is that Chuy had a blood condition known as polycythemia vera which manufactured blood cells that "get in each other's way" and form embolisms.[22]

We perceive absolutely nothing in the statements attributed to Dr. Nixon which can be construed as defamatory. In this modern era, with its greater medical knowledge and societal concern with health and

958. Although the marital troubles of the wealthy do not make them public figures, a professional athlete's contractual troubles relating to his playing performance commands the attention of a more sustained and wider public audience. *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 154–55, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion).

22. The pertinent statements in Brown's news article attributed to Dr. Nixon are the following:

"One of the consequences of Polycythemia Vera," said Dr. James Nixon, the Eagles' physician, "is that the blood cells get in each other's way. It's a definite threat to form embolisms, or emboli."

\* \* \* \* \* \*

The next thing we heard the family doctor had put him in the hospital. There, it was found that he had a pulmonary embolism.

\* \* \* \* \* \*

Subsequent x-rays showed fluid in the chest cavity and the presence of the disease known as Polycythemia Vera . . . "source unknown," according to Dr. Nixon. "Chuy was given anti-coagulants and the embolism cleared," Dr. Nixon added.

\* \* \* \* \* \*

"With such a pre-disposition to embolisms or emboli, it would be unwise to play football," the good doctor said. "The wise thing would be for him to give blood to the Red Cross and give it often. If he doesn't, he could get into trouble."

medical care, diseases and medical treatment are discussed candidly and freely in the home, in social circles, and in the media. For example, a malignancy suffered by the wife of the President of the United States, by a prominent United States senator, or by a movie star is front page public news. No one today treats such a communication as damaging to the esteem or reputation of the unfortunate victim in the community. The public's reaction today to a victim of cancer is usually one of sympathy rather than scorn, support and not rejection. Persons afflicted with cancer or other serious diseases, whether debilitating only or ultimately fatal, frequently carry on their personal or professional activities in today's enlightened world in normal fashion and without any deprecatory reflection whatsoever. Defamatory statements are those which discredit or debase a person's good name and standing or hold him up to public ridicule, hatred or contempt. *McAndrew v. Scranton Republican Publishing Company,* 165 Pa.Super. 276, 67 A.2d 730, *rev'd on other grounds* at 364 Pa. 504, 72 A.2d 780 (1949). The incurrence of a crippling or fatal illness is indeed unfortunate but, unless the disease is loathsome, it does not tarnish the victim's reputation or cause others to spurn him.

The dissent suggests, 1284 n. 3, that Chuy's claim for defamation might rest on section 573 of the Restatement (Second) of Torts (1977), which concerns slanderous imputations affecting business, trade, profession, or office. It is not clear that Chuy raised this argument in his cross-appeal.

Even if he did raise it, Chuy testified at trial that he spoke to the Eagles' general manager in January 1970 and "told him definitely that [he] would not be back to play." In February 1970, Dr. John W. Perry, who was Chuy's personal physician also advised Chuy "that he should not engage in serious strenuous physical activity, such as wrestling and football." Because his career as a football player was over then, and the article by Brown was not published until April 9, 1970, Chuy could not recover for comments in the article reflecting adversely on his fitness for that profession. As comment c to section 573 explains, for example,

> The imputation must be of such character as to disparage the other in the pursuit of this business, trade, profession or office or tend to harm him in it. Therefore an imputation of misconduct of a public officer whose term has expired does not come within the rule stated in this Section.

The dissent also discusses the possibility that the remarks reported in Brown's article harmed Chuy's possible opportunities to be a sportscaster. Chuy did not make this argument on appeal, and we find no evidence in this record of any professional interest by him as a broadcaster. We conclude as a matter of law that the statements attributed to Dr. Nixon were not capable of defamatory meaning.[23]

The judgment of the district court will be affirmed. The parties to bear their own costs.

---

23. In his separate statement, Judge Aldisert dissents, explaining that this is a diversity case and that he believes diversity cases should not be heard in banc. In support of his position he notes various proposals to restrict or eliminate the diversity jurisdiction of federal courts. Congress, however, has not yet seen fit to remove diversity jurisdiction from the federal courts, and until Congress acts, the parties have the right to invoke diversity jurisdiction even though they may have an alternative forum. In particular, the defendant in this case did not enter the federal courts voluntarily and did not consciously invite federal jurisdiction. It remains our duty to continue to adjudicate diversity cases in the absence of congressional legislation to the contrary and to give each litigant full and just appellate review, including in banc consideration whenever a majority of the court deem it necessary. Here, a majority voted for rehearing in banc. Hence, any discussion of our in banc procedure is irrelevant to the issues.

This particular case, moreover, has an importance that many diversity cases lack. A decision about defamatory meaning is indeed made here under state law. But because the law of defamation demands the accommodation of an interest in personal reputation and an interest in vigorous and full public discussion, this area of law has first amendment overtones. The first amendment, for example, dictates the standards of proof as to some elements of defamation.

VAN DUSEN, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's conclusion in part V of its opinion that the district court's denial of plaintiff's motion for new trial on the defamation count should be affirmed because the evidence did not support that count as a matter of law.

The uncontroverted evidence at trial indicated that polycythemia describes a number of different conditions involving excessive red blood cells. Stress polycythemia is not a life-threatening condition, while polycythemia vera is potentially fatal. All doctors who testified to having examined Mr. Chuy agreed that he definitely never suffered from polycythemia vera.

Despite Dr. Perry's qualified assurances that his records did not indicate that Chuy had polycythemia vera, a potentially fatal disease, Chuy testified that he believed Dr. Nixon would not have publicized his diagnosis unless true (N.T. 82; 349a). Chuy testified that his "mind just snapped" (*id.*). Even while in Dr. Perry's office, Mr. Chuy broke down emotionally (N.T. 83–84; 350a–51a). Afterwards Chuy became a "mental wreck," marital difficulties ensued, and his physical condition worsened (N.T. 84–88; 351a–55a). Several months elapsed before Mr. Chuy put himself under Dr. Perry's care and submitted to tests, which disproved the existence of polycythemia vera.

The jury answered the following questions:[1]

"7. Has the plaintiff proved by clear and convincing evidence that Dr. Nixon intentionally told Hugh Brown that Mr. Chuy was suffering from polycythemia vera?

| X | |
|---|---|
| Yes | No |

If the answer to Question 7 is no, then skip questions 8 through 11, and please inform the Marshal that you have completed your deliberations.

"8. (a) Has plaintiff proved by clear and convincing evidence that Dr. Nixon's statements about Mr. Chuy tended to injure Mr. Chuy in his business or profession, to harm his reputation by lowering him in the estimation of the community, or to deter others from associating or dealing with him?

| X | |
|---|---|
| Yes | No |

If the answer to Question 8(a) is No, then skip Question 8(b) and go on to Question 9.

(b) If the answer to 8(a) is Yes, has the plaintiff proved by clear and convincing evidence that Hugh Brown understood that publication of Dr. Nixon's statements about Mr. Chuy would tend to injure Mr. Chuy in his business or profession, to harm his reputation by lowering him in the estimation of the community or to deter others from association or dealing with him?

| | X " |
|---|---|
| Yes | No |

The jury found, in answer to interrogatory 7, that the plaintiff proved by clear and convincing evidence that Dr. Nixon intentionally told Mr. Brown that Don Chuy was suffering from polycythemia vera (App. 968a). The jury was also asked to determine whether all of Dr. Nixon's statements quoted in the newspaper article, when taken together, tended to injure Mr. Chuy's

---

1. Also, the jury answered questions 6(a) and (b) as follows:

"6. Has the plaintiff proved by a fair preponderance of the evidence that:

(a) The Eagles exerted any actual control over the substance of statements by Dr. Nixon to the press concerning the physical condition of Eagles players?

| X | |
|---|---|
| Yes | No |

(b) The Eagles by virtue of their relationship with Dr. Nixon had the right to control the substance of statements by Dr. Nixon to the press concerning the physical condition of Eagles players?

| X | " |
|---|---|
| Yes | No |

reputation (App. 938a). Finally, the jury was asked whether Mr. Brown understood that publication of Dr. Nixon's statements would tend to injure Mr. Chuy's reputation. The jury, in response to question 8(a), answered affirmatively that dissemination of Dr. Nixon's remarks tended to injure Mr. Chuy's reputation.

In Pennsylvania, defamation claims are governed by long established common law standards, as well as burden of proof rules prescribed by statute, 12 Pa.Stat.Ann. § 1584a (Purdon Supp.1978). Plaintiffs must first prove the defamatory character of particular communications. The Pennsylvania Supreme Court has adopted the definition of a defamatory communication as contained in the First Restatement of Torts:

> "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

*Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971), *quoting* Restatement of Torts § 559 (1938).[2] Also, the Pennsylvania Supreme Court has shown a concern for protecting business interests in its definition of libel. In *Corabi*, 441 Pa. at 442, 273 A.2d at 904, the court said:

> "A libel is a maliciously written or printed publication *which tends* to blacken a person's reputation or to expose him to public hatred, contempt or ridicule, or *to injure him in his business or profession*." (Emphasis added.)[3]

In the first instance, the trial court must determine whether a particular communica-

tion is capable of a defamatory meaning. *Id.; Cosgrove Studio & Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962) (*citing* Restatement of Torts § 614(1)).

Hugh Brown's column in the Philadelphia Bulletin on April 9, 1970, reported that a Dr. Harrell had examined Don Chuy and diagnosed a pulmonary embolism and recommended that Chuy no longer participate in contact sports such as pro football and wrestling. This report of Dr. Harrell's examination was uncontroverted in the record. The truth, which plaintiff did not deny, was that his predisposition to embolisms dictated his retirement from football. In the same article, Dr. Nixon was quoted as confirming Dr. Harrell's diagnosis and recommendation. In addition, the article quotes and paraphrases an assessment by Dr. Nixon that Chuy had polycythemia vera, which involved the probability of the formation of emboli. This single statement was false. The issue is whether the untrue remark, set against the backdrop of the accurate information in the article, was capable of defamatory meaning: that is, of a meaning that would tend "so to harm the reputation of [Chuy] as to lower him in the estimation of the community *or to deter third persons from associating or dealing with him*."

Reading the article in its entirety, a reader might have understood that polycythemia vera was the direct cause of Mr. Chuy's forced, premature retirement from pro football, and might have understood or learned that polycythemia vera was potentially fatal. Where the imputation of a fatal physical disease is explicitly related in

---

**2.** The revised Second Restatement retains intact the First Restatement's definition of defamatory meaning. Restatement (Second) of Torts § 559 (1977).

**3.** The above-quoted language also appears in these Pennsylvania decisions: *Volomino v. Messenger Pub. Co.*, 410 Pa. 611, 613, 189 A.2d 873, 874–75 (1963); *Bogash v. Elkins*, 405 Pa. 437, 439, 176 A.2d 677, 678 (1962); *Mengel v. Reading Eagle Co.*, 241 Pa. 367, 370–71, 88 A. 660, 661 (1913). In addition, the Pennsylvania Supreme Court has followed § 573 of the Restatement of Torts, which provides:

> "§ 573. Slanderous Imputations Affecting Conduct of Business, Trade, or Profession.
> "One who falsely and without a privilege to do so, publishes a slander which ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, [or] profession . . . is liable to the other."

*See Cosgrove Studio & Camera Shop, Inc. v. Pane*, 408 Pa. 314, 320, 182 A.2d 751, 754 (1962); *Fegley v. Morthimer*, 204 Pa.Super. 54, 56–57, 202 A.2d 125, 126 (1964).

the allegedly defamatory communication to a person's professional demise, his business stature has been seriously weakened. For example, to name just one possibility, it is not uncommon for retired professional athletes to be offered professional opportunities in sportscasting, or in advertising, or even in other, less strenuous sports. Those persons who would otherwise approach Mr. Chuy with such opportunities might be deterred from associating or dealing with him in this professional capacity if they thought that he was suffering from a potentially fatal disease. It is in this context that I conclude that Dr. Nixon's imputation to Don Chuy of a potentially fatal illness might have been understood as conveying a defamatory meaning.[4]

The jury must be charged with determining whether plaintiff proved that the "recipient" of the communication understood it as defamatory. 12 Pa.Stat.Ann. § 1584a(1)(d) (Purdon's Supp.1978). The district court charged the jury to consider Hugh Brown as the recipient and to consider whether he personally understood that publication of Dr. Nixon's statements would cause Don Chuy harm (935a, 938a–39a). The interrogatories split into 8(a) and 8(b) distinguished between the jury's understanding and Mr. Brown's understanding of the meaning of Dr. Nixon's statements.

I believe that the district court erred in treating the sportswriter as the relevant "recipient" within the meaning of Pennsylvania law. Defamatory words spoken to a newspaper reporter for attribution in a column should be deemed communicated not alone to the reporter but also to the general readership of the newspaper. The jury in this case should have been asked whether the average reader of the Philadelphia Bulletin understood Dr. Nixon's statements as harming Chuy's reputation.[5] *See Sellers v. Time, Inc.*, 423 F.2d 887, 889–90 (3d Cir. 1970).

Clearly Mr. Brown's personal comprehension of the effect of publication of Dr. Nixon's statements need not have corresponded with the average reader's actual understanding. The contrary answers to interrogatories 8(a) and 8(b) indicate that the jury understood the defamatory potential of Dr. Nixon's statements differently from Mr. Brown. The jury's finding that the statements tended to harm Mr. Chuy's reputation may well have implicitly represented the jurors' own understanding as average readers or their perception of how other average readers would have understood the statements. In sum, I conclude that the district court erred in not submitting to the jury a question as to whether the average reader understood Dr. Nixon's statements taken in the context of the article as tending to injure Mr. Chuy's professional reputation.[6] This error necessitates a

---

**4.** I conclude only that Dr. Nixon's false statement was capable of defamatory meaning, not that it was so understood nor that it was the proximate cause of any actual damages sustained by Don Chuy. *See* Restatement (Second) of Torts § 559, comment d; *id.* §§ 621, 622A.

**5.** Because the newspaper has not been sued, I do not view this as a libel action for republication of a defamatory remark. Nor do I construe the newspaper as an agent for the Eagles in propagating Dr. Nixon's statements. My view that the newspaper readership was the relevant "recipient," and not Mr. Brown to whom the words were spoken, is bolstered by the Restatement's treatment of publication by a third person. In comment f to § 577 of the Restatement (Second) of Torts (1977), the view is expressed that an individual's intent that slanderous words be reduced to writing, followed by their subsequent embodiment, ren-

ders the speaker liable for libel as well as slander. Thus, a news source's revelations to a reporter are properly treated as libelous when printed in the evening paper. As a corollary, the readers of the libel are its recipients and the reporter is the recipient of the slander.

**6.** The following answers to questions 9(a) and (b) make it not improbable that the jury would have found liability for defamation if question 8(b) had been properly worded and the charge had made clear that the average reader's understanding of Dr. Nixon's statement was controlling:

"9. (a) Has the plaintiff proved by clear and convincing evidence that it was the natural and probable consequence of Dr. Nixon's making that statement to Mr. Brown that it would come to the direct attention of the plaintiff, Donald Chuy?

remand on plaintiff's defamation claim in my view.

If the jury finds on a retrial that the average reader would learn that polycythemia vera was so debilitating that he would cease associating with Chuy or not consider him for a position such as that of sportscaster, then Dr. Nixon's statement would be defamatory.[7] I believe that the court is required by this record to decide that Dr. Nixon's statement is capable of such lay readership understanding.

In arguing for a remand, the plaintiff also disputed the district court's conclusion that Don Chuy was a "public figure" and claimed that his burden of proof need not have required him to produce clear and convincing evidence. I concur in the majority's conclusion that Don Chuy was a "public figure" who must meet a constitutionally mandated higher standard of proof on the issue of actual malice than other defamed plaintiffs.[8]

I would remand for a new trial limited to the defamation claim of Chuy's complaint.

SEITZ, Chief Judge, and GIBBONS, Circuit Judge, join in the foregoing opinion dissenting in part from the opinion of the court. For reasons set forth in his separate statement, ALDISERT, Circuit Judge, joins in this dissent.

$$\frac{X}{\text{Yes}} \qquad \frac{\phantom{X}}{\text{No}}$$

If the answer to Question 9(a) is No, skip Question 9(b).

(b) If the answer to Question 9(a) is Yes, has the plaintiff proved by clear and convincing evidence that under all the facts and circumstances of this case as you find them to be, Dr. Nixon's making that statement to Mr. Brown constituted shocking or outrageous conduct on his part, or exceeded the bounds of decency, with respect to its natural and probable impact on plaintiff, Donald Chuy?

$$\frac{X}{\text{Yes}} \qquad \frac{\phantom{X}"}{\text{No}}$$

7. It seems clear that a defendant who knowingly spread an inaccurate rumor that a plaintiff being considered for presidency of a corporation had cancer could be found liable for defa-

Statement of ALDISERT, Circuit Judge, with whom VAN DUSEN, Circuit Judge, joins.

What divides this court is not a matter of institutional or precedential significance. Nor is it disagreement over the choice of a controlling legal precept, the interpretation thereof, or the application of the precept as chosen and interpreted to the facts at hand. Rather, this court divides on a *prediction*. The majority offers an educated guess as to what the Pennsylvania Supreme Court would do if faced with the same facts; the dissenters offer theirs. This is the nature of diversity cases in the federal courts of appeals.

The opinions in this case are impressive expressions of thoughtful analysis and careful craftsmanship, but they are no more than legal essays without institutional significance. They are not "performative utterances," to use Professor J. L. Austin's description of an orthodox appellate opinion. The opinion of the court has no controlling precedential value because the Pennsylvania judicial system is free to accept or reject any analysis of state law pronounced by a federal court.

I fail to see how a majority of this court's judges could have ordered in banc consideration of the panel's decision while respecting both the letter and spirit of Fed.R. App.P. 35:

mation under the language from the Restatement of Torts quoted at page 1284 above. Thus, I am not persuaded by the majority's effort to confine defamation by attribution of illness to venereal diseases or leprosy.

8. A public figure may recover only if he proves that the defamatory statement was made with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). In this case, Dr. Nixon admitted that Chuy did not have polycythemia vera and the jury found, "by clear and convincing evidence," in answer to question 7 "that Dr. Nixon intentionally told Hugh Brown that Mr. Chuy was suffering from polycythemia vera." Thus, a finding of actual malice was properly made by the district court without submission of a special interrogatory to the jury.

[Rehearing in banc] is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance.

Although I concede that the issues are, as the court states, "interesting," I cannot agree that this appeal presents "a question of exceptional importance" deserving in banc consideration.[1]

Moreover, the energies of the full court have been committed to a diversity case at a time when Congress has seriously questioned the advisability of retaining federal jurisdiction in diversity cases. On February 28, 1978, by a vote of 266–133, the House passed H.R. 9622 which would have abolished diversity jurisdiction. A companion Senate Bill, S. 2389, was also introduced in the 95th Congress. A more moderate proposal, S. 2094, would have limited diversity jurisdiction by preventing a plaintiff from bringing a diversity suit in his home state. A conference committee was unable to achieve agreement, so the legislation was not enacted. Congressional Quarterly 3055 (October 21, 1978). Nevertheless, Professor Daniel Meador, Assistant Attorney General, testified before the House Committee that the Justice Department supports legislation which would restrict or reduce diversity jurisdiction. Professor Meador stated that such legislation is necessary

to equip the federal judiciary to adjudicate expeditiously and economically the unprecedented volume of civil cases.

This increase in volume is not illusory. The number of civil filings in 1977 was 130,567; an increase of 49.5 percent over the number in 1970, when the last increase in judges occurred. Because of the Speedy Trial Act of 1974, federal judges have been giving priority to criminal cases at the expense of the civil calendar. As a result, the number of civil cases pending increased 63.3 percent from 1970 to 1977. Because of this congestion, it now takes longer, with few exceptions, to dispose of a civil case in a federal district court than it does for a state court system to dispose of a comparable case.

Congressional Record E3792, July 14, 1978.

For these reasons, I believe the court improvidently granted rehearing in banc. I join in the dissenting opinion which reflects the views of the original panel.

---

1. It will be noted that the court divides solely on a state law issue. There is complete agreement on the first amendment considerations.